```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          14 CR 130 (LAP)

5    JAMAL DEHOYOS,

6              Defendant.

7    ------------------------------x

8                                          New York, N.Y.
                                           October 23, 2017
9                                          10:00 a.m.

10

11   Before:

                        HON. LORETTA A. PRESKA,
12
                                          District Judge
13

14                       APPEARANCES

15   JOON H. KIM
          Acting United States Attorney for the
16        Southern District of New York
     LOUIS PELLEGRINO
17        Assistant United States Attorney

18   MEGAN BENNETT
          Attorney for Defendant
19

20

21

22

23

24

25
```

1              THE COURT:  United States v. Jamal Dehoyos.  Is the

2      government ready?

3              MR. PELLEGRINO:  The government is ready, your Honor.

4              THE COURT:  Good morning.  Is the defense ready?

5              MS. BENNETT:  Yes, your Honor.  Good morning.

6              THE COURT:  Ms. Bennett, have you and your client had

7      adequate time to review the presentence report?

8              MS. BENNETT:  We have, your Honor.

9              THE COURT:  Is there any reason it should not be made

10     part of the record?

11             MS. BENNETT:  No, subject to the issues raised in the

12     defense sentencing submission, we have no concerns about its

13     admission.

14             THE COURT:  Are there any objections to the

15     presentence report?

16             MS. BENNETT:  The defense objects to the calculation

17     of Mr. Dehoyos's criminal history category with respect to the

18     youthful offender adjudication, and as mentioned in the defense

19     sentencing submission, there are I believe some inaccuracies,

20     although I don't think those bear -- they certainly don't bear

21     on the offense conduct nor do they directly bear on the issue

22     of the criminal history calculation.  But to the extent they

23     suggested that Mr. Dehoyos was being less than forthcoming

24     during the presentence investigation report, I wanted to make

25     sure the Court and the record reflected that there was

1    information in the presentence investigation report that was

2    contradicted by evidence, such as Mr. Dehoyos's absence of a

3    driver's license.  The PSR says there was no record of that,

4    and in fact as we submitted to the Court he does have a

5    driver's license that was valid at the time of the presentence

6    investigation interview.

7           And the issue of Mr. Dehoyos's second daughter which

8    the presentence investigation report suggested he had

9    intentionally withheld information about.  There was a

10   discussion of his relationship with that child's mother.  And

11   as noted in the materials handed up today, the belated proposed

12   Exhibit N which is letters from the family, Mr. Dehoyos does

13   have a relationship with that daughter.

14          THE COURT:  And I note that the government in its

15   sentencing memorandum notes that the parties had contemplated

16   that the defendant's criminal history category would be III and

17   his guidelines range would be 51 to 63 months.

18          MR. PELLEGRINO:  That's correct, your Honor.

19          THE COURT:  Anything else on that?

20          MS. BENNETT:  Nothing from the defense, your Honor.

21          THE COURT:  Very well then.  With respect to the

22   offense level computation, I accept the findings of the

23   presentence report set forth at paragraphs 53 through 64, which

24   conclude that a total offense level of 22 is appropriate.

25          With respect to the defendant's criminal history, I

HAN3DEHS                     Sentence

accept the agreement of the parties that Mr. Dehoyos has five

criminal history points, based on three points for his June 14,

2007 conviction for criminal possession of a weapon, and his

subsequent sentence on that conviction, as well as two points

because the defendant committed the instant offense while on

parole.  As a result, the defendant's criminal history category

is III, and his guidelines range is 51 to 63 months.

         As I mentioned, I have the government's submission

dated October 19, 2017.  I have the defense submission dated

October 10, 2017, together with the documents handed up this

morning, the additional exhibits, the work report and the like.

         Are there any more written materials I should be

looking at?

         MS. BENNETT:  No, your Honor.  I think this is

probably incorporated with what you have as filed on

October 10, 2017.  But there were two additional exhibits to

Mr. Dehoyos's sentencing submission that were submitted late.

One on October 13, and one on October 19.  And those are, if

you go to the back of the packet of materials, you would find

them as ECF document numbers 239-1 and 240-1.

         THE COURT:  Yes, ma'am.

         MS. BENNETT:  Okay.

         THE COURT:  Thank you.

         MS. BENNETT:  With the proposed Exhibit N that I

submit today, which were letters of support from Mr. Dehoyos's

1    family and friends and then the most recent work reports,

2    that's everything that the defense submitted in writing.

3          THE COURT:  Yes, ma'am.  Would you like to speak on

4    behalf of Mr. Dehoyos.

5          MS. BENNETT:  I would, thank you, your Honor.  First

6    for the record I would like to point out that a representative

7    from the Focus Forward is in the audience.

8          I don't want to go over the chapter and verse of

9    everything that was submitted in writing, but I do think this

10   is -- I know that this is an important proceeding for

11   Mr. Dehoyos, and that this has been a monumental two years in

12   the course of his life, and I would like to go over a few

13   certain especially important points with respect to both his

14   history and characteristics, the offense conduct, and then the

15   conduct over the past the two years of incarceration.

16         Starting with Mr. Dehoyos's history and

17   characteristics.  I think there is no question that we all

18   begin our lives at different starting lines, and Mr. Dehoyos

19   began his life at a starting line I think none of us would want

20   to see a child begin.  He was born into a completely chaotic

21   household.  He was raised or he was supposedly raised by a

22   street hustler father and a mother who was under the total

23   domination of her husband.  It was a house in which emotional

24   and physical abuse was a constant and recurring normal cycle of

25   events.  It was a household in which both of his parents were

engaged in the drug trade.  And it was a household in which at

the age of just over 15, 16 years old, Mr. Dehoyos had his

first contact with the criminal justice system.

        And it was then -- I think of this as the turning

point and I was reflecting on it when I was considering what

happened in Jamal's life, and there was the time that I read

Romeo and Juliet a thousand years ago, and there is the moment

when Tybalt kills Mercutio, and it is that moment where

everything changes.  And had it not been for that moment, Romeo

wouldn't have killed Tybalt and the Montagues and Capulets

would not have embarked on the feud that ultimately resulted in

the tragic end of the Shakespeare play.

        And I think for Jamal's life, it may be that the

outcome wouldn't have been the same had it not been for that

arrest when he was 16.  But it is that arrest when the police

are in his home and there are guns in his mother's bedroom, and

that's documented in I believe one of the exhibits that I

submitted, and when he is standing there thinking about the

mother who his father has constantly abused, the mother who for

whatever failures she exhibited as a parent, is still the

person, aside from his grandmother, to whom he is closest in

his life.  And he says that the guns are mine.  And I'm not

disputing that he took responsibility for those weapons, and I

don't know enough to be able to even say that there was an

issue about them being his weapons.

1        But when you think about the fact that had it been two

2   weeks earlier, he would have been in the juvenile justice

3   system where he would have had access to an entirely different

4   set of opportunities.  And while he was adjudicated as a

5   youthful offender, he was treated by his household and

6   certainly at the time of the arrest as somebody who was far

7   beyond his age and his experience.  And I can't help but wonder

8   what would have happened with the next 25 years had that moment

9   been different.

10       And it certainly true that over the next 25 years he

11  did exhibit a lack of respect for the public safety, for the

12  public good.  There was the drug sale that is reflected in his

13  criminal record.  There is attempted criminal sale of a

14  controlled substance.  There was I think probably most

15  troubling the firearm incident, which was based on -- I offer

16  this information not in any way to suggest that the public

17  threat was diminished because of this, but to put it in

18  context.  It was a middle of the night dispute with an

19  individual who was known by the police to be a neighborhood

20  drug dealer.  And I say that in order that the Court understand

21  that Mr. Dehoyos is, while he has this history, he is not a

22  person who has acted without consideration for the larger --

23  this was not an act of random violence and he served a

24  substantial sentence on that case.

25       But I think that it is, it is perhaps the part of

HAN3DEHS                          Sentence

Mr. Dehoyos's record that the Court might have the most concern

with.  But it is an isolated incident in the course of his 40

plus years.

THE COURT:  Well, shooting at people --

MS. BENNETT:  I understand.

THE COURT:  -- is a fairly significant isolated

incident.

MS. BENNETT:  It is, it is.  And I'm not quite sure --

this is something that for two years Jamal and I have been

talking about.  I don't think there is anything to be added to

what the Court has.  I wanted to raise the factual context of

the conviction not to suggest that shooting at a drug dealer is

in any way acceptable behavior.  But to explain what the

series -- what -- what the context was of that event.  And

there is no, there is no way in which it can be explained or

minimized.

If Mr. Dehoyos feels like speaking to it, he is a

thoughtful and articulate and introspective individual.  He

could.  But I believe that the record speaks for itself and in

that case and he did accept responsibility.  I know there was a

recalcitrant witness.  He promptly pleaded guilty in that case,

irrespective of what the facts might have shown at trial.

And when I say it was isolated, I mean that this, he

is not, he is not alleged to have been one of the individuals

in this case who carried a firearm, who arranged for firearms.

1    And I just wanted to sort of separate out the 2006 incident

2    from the current robbery conspiracy.

3              But I'd like to talk a little bit more about the past

4    two years of Mr. Dehoyos's life which I think when considering

5    the 3553(a) factors provide some guidance looking prospectively

6    at what we can expect, as opposed to retrospectively at how he

7    should be punished for his behavior.

8              I know the Court has sentenced several other

9    co-defendants, but I believe the last one was some time ago

10   although I'm not sure if Mr. Hardin has been sentenced yet.

11             In several of those cases, it appeared from the

12   sentencing minutes that the plea agreement restricted -- there

13   was a provision in which defense counsel agreed not to ask for

14   a variance under 3553(a), and the government at least in a

15   couple of those sentencing proceedings pointed out on the

16   record the reason for that is that the individuals' role in the

17   conspiracy and the robbery was sufficiently serious they didn't

18   believe 3553 variances would be justified, although obviously

19   the Court always retains the discretion to fashion a sentence

20   that is sufficient, but not greater than necessary.

21             Mr. Dehoyos's plea agreement didn't have that same

22   restriction.  I don't know if that was a change in the policy

23   of the office, but it does suggest to me that the government

24   recognizes that his role in this case was somewhat different

25   than that of his co-defendants.  The offense conduct here, the

Court obviously knows from having sentenced several of the

co-defendants that the gravity of the offenses and the impact

that those have had on several of the jewelry store owners

Mr. Dehoyos was involved in the January 2013 robbery in

Cranford, New Jersey.

His brother Tyrone, as the Court knows, had a much

larger role in this case.  The government says in its

sentencing submission that Mr. Dehoyos had a individual

relationship with John who is the leader.  I think that's based

entirely on Tyrone's relationship with Mr. Robinson and Tyrone

and Jamal being siblings and living together from time to time

there was some overlap between their acquaintances, but it is

my understanding that Jamal Dehoyos's role in this crew was

largely driven by his -- by his relationship with his brother.

Not that he didn't enter it of his own accord, but that he was

introduced to this by his brother Tyrone.

The fact that he was in a car, the government says in

its sentencing submission and describes, as I understand the

conspiracy to have operated, that often John Robinson for

example would be several steps removed from the individuals who

were going into the stores, and the government mentions this in

their sentencing submission here to point out that just because

Jamal was in a car doesn't mean he had a relatively minor role.

I would point out that John Robinson had a leadership

enhancement in his case.  John Robinson was the leader of this

1   organization.  There is no allegation, and the government

2   concedes there is no allegation that Jamal was anything other

3   than involved in an individual incident.  There is no

4   suggestion that he was a leader or high up in this crew by any

5   stretch.  And that I think the fact he is in this vehicle and

6   he is -- I believe there was a state arrest in New Jersey of

7   Tyrone and Jamal Dehoyos actually bailed out his brother there.

8   And he was in the car, he was there to facilitate the

9   January 2013 events.  But his being in the car I don't think

10  should suggest that he had a senior role in that January 2013

11  robbery.

12           And while there is a four-point enhancement here for

13  the use of the sledge hammer, again that was -- and Mr. Dehoyos

14  did acknowledge understanding that force might have been used

15  in the course of this robbery, again this is not, he is not an

16  individual who wielded the sledge hammer or who was involved in

17  procuring it in this case.  His role was closer to that of

18  Kendall Thompson.  I'm sorry.  Actually I think it was closer

19  to Terrell Ratliff.  He was also involved in an individual

20  robbery.  And I believe there was the use of a sledge hammer in

21  that individual robbery.  There was no, I don't believe there

22  was a weapon enhancement in his case.  But I think the facts of

23  his robbery are sort of the most closely analogous to the

24  robbery in which Mr. Dehoyos was involved.

25           I would just briefly like to talk about what Jamal has

HAN3DEHS                      Sentence

1    done over the past two years if the Court will indulge me a few

2    more moments.

3           I don't think it can be easy being on the edge of 40

4    and facing a substantial prison sentence.  And it certainly

5    can't be easy under Jamal's circumstances, given the loss of

6    his grandmother who was the only stable influence in his life,

7    shortly before his incarceration here.  Given the role that his

8    brother had in this case, of which he was keenly aware, and I

9    think for somebody of his background, we might have expected a

10   different adjustment to incarceration.

11          From the moment that he arrived at the MCC, he, he has

12   shown himself to be a good citizen, he's shown himself to be

13   committed to his rehabilitation, and I think most importantly,

14   he's shown himself to be committed to the betterment of his

15   peers there and of the environment in general.

16          He completed, as the Court knows, he completed the

17   Focus Forward program.  Mr. Neeling is here now.  He

18   participated in almost more programs than I knew existed at the

19   MCC.  He joined the Moth Community Storytelling program.  I had

20   beautiful feedback from the organizers of the storytelling

21   program, Cindy Freeman who ran his group tried very, very hard

22   to be here, and was told as she had been told by prison

23   personnel originally she couldn't write a letter on his behalf.

24   She was told she can't appear here.  And the last communication

25   I had from her was this morning where she said made one last

1    effort and told she couldn't be here because of the concern she

2    would have the appearance of bias in any future -- at any

3    future groups that she was leading.

4              But Jamal's dedication, his commitment, his

5    enthusiasm, were evident to everybody with whom he was involved

6    in these programs.  I think that what is most, to me what

7    emblemizes the past two years was his role in the inmate

8    companion program.  And there is the letter from another inmate

9    at the MCC that talks about how helpful Jamal was when this

10   individual felt like there was no hope at all.  And that Jamal

11   was able to help him see hope in his own life, which I think

12   Jamal can only do if he recognized there was hope in his own

13   life.

14             And again, for somebody with his background and at his

15   age to believe in a future requires a deep commitment, and a

16   leap of faith almost in some ways.  But I think through the his

17   good acts he has shown himself that he has the potential to

18   live outside the prison system the way he has lived for the

19   past two years.  Jamal's daughter also in the audience now.

20             THE COURT:  Good morning.

21             MS. BENNETT:  And cousin Evelyn is here as well and

22   Mr. Dehoyos's cousin Evelyn is seated next to Ms. Dehoyos.  The

23   warden in this case, the warden at the MCC wrote a letter to

24   the Court.  I can't tell you how long I've been trying to get

25   them to provide the letter.  And it was the tenacity and

1   persistence of Mr. Dehoyos really prompted that.  Officer

2   Hodges whose letter I submitted to the Court, also had asked to

3   be here today and was told by Adam Johnson we would have to

4   submit a Touhy letter and an executed subpoena which I

5   provided, but Adam Johnson never responded to me.  But Officer

6   Hodges, who I met with in person when he wrote and signed the

7   letter that was submitted to the Court told me that Jamal was

8   instrumental not just in that incident detailed in Officer

9   Hodge's letter but generally as a citizen of 9 South.  He is an

10  elder statesman who has been able to provide the younger men

11  with whom he is living some sense of how you can mature and how

12  you can have hope to live a life on the outside that is

13  productive, that is collaborative, that is law abiding.

14          I was moved, especially, by the comments in the Moth

15  letter about how he was -- had the insight to reflect upon the

16  good in his background.  And in his childhood there was very

17  little but he could extract the good from Susana who taught him

18  how to cook, that he was going to have to take care of himself.

19  As Focus Forward said he was willing to open up and make

20  himself vulnerable in a way that had a ripple effect on all the

21  other participants in that class.  He never made excuses for

22  his past.  He was enthusiastic, he was questioning, he was

23  curious, he has explored the drive change.  He has a plan to

24  work in the food services industry as soon as he is able to.

25  As soon as he is released from custody.

HAN3DEHS                        Sentence

1              I think one of the things that has been really hard

2      about this case is that Tyrone, in addition to whatever sense

3      of betrayal he may have given Tyrone's role in the case, there

4      was also the hope that Jamal was going to start this food truck

5      and that he was going to do with that the proceeds of the sale

6      of the family home, and those proceeds had been distributed

7      differently than he had believed they would.  But despite that,

8      he has still remained hopeful.  And he has shared that hope

9      with his fellow inmates.  He has demonstrated that he can take

10     that optimism, that commitment, that insightfulness, that

11     understanding of his past, and he can channel that into a

12     positive ventures and he's done that for the past two years.

13     He is committed to continuing it do that in the future, and I

14     think the question then is what sentence beyond what he has

15     already served will accomplish the goals of 3553.  Will be

16     sufficient, but not greater than necessary, to accomplish those

17     goals.

18             And I would suggest that a sentence proposed in the

19     defense letter of 24 months is serious, reflects his role in

20     this case, and his particular offense conduct and also takes

21     into account his substantial good deeds.  His herculean efforts

22     at rehabilitation.  His commitment to his community, to his

23     neighbors, to his friends and to his family.  Thank you, your

24     Honor.

25             THE COURT:  One concern I have, counsel, about your

HAN3DEHS                         Sentence

1    suggestion is I think it would result in Mr. Dehoyos's being

2    released pretty soon.  Often BOP suggests a period in a

3    community confinement center to allow an individual to

4    transition back to society.  And I wonder if given the history

5    here that's not something that might be useful.

6              MS. BENNETT:  I think that's an excellent point.  And

7    I think in the judgment and commitment order if the sentence

8    were to specifically sentence Mr. Dehoyos to such a facility,

9    that that would be a useful and appropriate transition from

10   incarceration to a return to society.

11             My concern with adding a sentence with additional time

12   is that in my experience, at least, bureau of prisons doesn't

13   necessarily, even though we expect them and they sometimes do,

14   place an individual with six months or so of incarceration left

15   into a community housing facility or a halfway house.  That is

16   not always the case.  And I've had more success in the

17   placements if the sentence itself directs that the sentence

18   should be placement in a community housing center, and I would

19   say that's something that would match what we might expect the

20   bureau of prisons to transition an individual to at the end of

21   their sentence would be appropriate, which I think would be

22   sometimes I think it is sometimes six months, sometimes a

23   little bit longer.

24             THE COURT:  Thank you.

25             MS. BENNETT:  Thank you, Judge.

HAN3DEHS                          Sentence

1              THE COURT:  Mr. Dehoyos, would you like to speak on

2      your own behalf.

3              THE DEFENDANT:  Yes, I do.

4              THE COURT:  Yes, sir.

5              THE DEFENDANT:  Good morning, first of all, your

6      Honor.

7              THE COURT:  Good morning, sir.

8              THE DEFENDANT:  I would like to apologize to the

9      jewelry store owner, the Martin Jewelry Store.  I definitely,

10     I'm greatly sorry for what I've done and with the part I played

11     in that role of that jewelry store robbery.

12             I also would like to apologize to my daughter for not

13     being a good father.  Being in and out of prison my whole life.

14     You know.  And I definitely want to thank Grant for being here

15     today.  Thanks.  You know.

16             Your Honor, I been in and out of prison for all my

17     life.  For as long as I can remember this is the life I knew.

18     It took me to be 42 years old to come to MCC to realize it is

19     not the right way to live.  I went down the wrong path.  I was

20     taught the wrong way.  And I changed.  I felt that I changed

21     being at MCC for the better.  I changed now like I never

22     changed before or any time I ever did prison time, it was

23     never, it was never a change in me.  It took me to come here to

24     realize that I'm 41 years old and I'm in front of a judge

25     again.  You know, my life in her hands.  And I feel like I did

HAN3DEHS                     Sentence

```
1   rehabilitate this time.  I can't say that, you know, my part in

2   this crime was as heavy as the other guys or whatever the case

3   may be but I did, I was there.  I shouldn't have been there.

4   You know.

5        But sometimes, it's just, I guess it was family, money

6   that drove me to do the things that I have done in the past.

7   And now, learning from that mistake that I did was a great

8   mistake, I would never do it again.  I would never, you know,

9   submit myself to fall for the root of evil which is money or

10  even helping out a family member.  With that I say, you know,

11  I'm sorry for what I did.  Thank you.

12       THE COURT:  Thank you, sir.  Does the government wish

13  to be heard?

14       MR. PELLEGRINO:  No, thank you, your Honor.  We're

15  happy to rest on our submission unless the Court has any

16  questions.

17       THE COURT:  Thank you.  Counsel, as you know, I have

18  calculated the guidelines and certainly take them into account.

19       The total offense level in my view accurately reflects

20  the nature and circumstances of the offense.  With respect to

21  the defendant's history and characteristics, as counsel has

22  talked about both in the sentencing submission and today,

23  Mr. Dehoyos did not have a lot going for him coming into this

24  situation.  On the other hand, counsel has pointed out and his

25  words make clear, that he has a great deal of remorse about
```

1      this situation, and has in his words been rehabilitated.  For

2      that reason, I find that the guidelines sentence that is

3      prescribed is greater than what is necessary to promote the

4      sentencing factors.

5              With respect to the paragraph 2 factors, certainly an

6      incarceratory sentence is required to reflect the seriousness

7      of the offense, but in this instance, the guideline sentence

8      prescribed as I've mentioned is greater than what is necessary.

9      Certainly some period of incarceration is required for public

10     deterrence.  I am persuaded, however, in light of Mr. Dehoyos's

11     work since he has been incarcerated, that significantly more

12     incarceration is not required to protect the public from

13     further crimes of this defendant.  The paragraph D factors of

14     educational or vocational training are less important here.

15             I have in mind the paragraph 3, 4, and 5 factors.

16     With respect to paragraph 6, the need to avoid unwarranted

17     sentencing disparities, in this instance, I think everybody is

18     in agreement that among these defendants, Mr. Dehoyos's role

19     was probably the least significant.  Also, the extraordinary

20     rehabilitation that Mr. Dehoyos has demonstrated will make any

21     perceived disparity one that is warranted.

22             Taking all of these factors into account, counsel, it

23     is my intention to impose a sentence of 24 months'

24     incarceration, followed by three years of supervised release,

25     with a special condition of six months in a halfway house.  It

HAN3DEHS                    Sentence

1    is also my intention to adopt the other suggested special

2    conditions of outpatient substance abuse treatment, the search

3    condition, not incurring credit charges unless in compliance

4    with the installment payment schedule, and providing the

5    probation officer access to requested financial information.

6            It is also my intention to impose the restitution

7    amount of $36,000, jointly and severally.  It is also my

8    intention to impose the mandatory $100 special assessment.

9            Counsel, is there any reason why such a sentence

10   should the not be imposed?

11           MR. PELLEGRINO:  No, your Honor.

12           MS. BENNETT:  No, your Honor.

13           THE COURT:  Very well, then.  Mr. Dehoyos.

14           THE DEFENDANT:  Yes, ma'am.

15           THE COURT:  You're sentenced, sir, to a period of 24

16   months' incarceration.  Following that time, you'll spend a

17   period of three years on supervised release.  During the period

18   of supervised release, you'll comply with all of the standard

19   terms and conditions of supervised release.  Among them are

20   that you not commit another federal, state or local crime; you

21   not illegally possess a controlled substance; and you not

22   possess a firearm or other destructive device.

23           In addition to those and all of the other standard

24   terms and conditions of supervised release, during that time

25   you'll spend a period of six months in a halfway house, and of

HAN3DEHS                          Sentence

1    course you'll comply with all of the terms and conditions of

2    that are applicable there.

3            In addition, sir, during that period, you'll

4    participate in an outpatient treatment program for substance

5    abuse, as approved by the probation officer.  That program will

6    include testing to determine whether you've gone back to the

7    use of drugs.  The Court authorizes the release of available

8    drug treatment evaluations and reports, including the

9    presentence investigation report, to the substance abuse

10   treatment provider as approved by the probation officer.  Sir,

11   you might be required to pay some, or all, of the costs of that

12   program, depending on your ability to pay and the availability

13   of third-party payment.

14           In addition, sir, during that period, you'll submit

15   your person, residence, place of business, vehicle, and any

16   other property or electronic devices under your control to a

17   search on the ground that the probation officer has reasonable

18   suspicion that contraband or evidence of a violation of the

19   terms and conditions of your release may can be found there.

20   Such a search must be conducted at a reasonable time and in a

21   reasonable manner.  Failure to submit to such a search might be

22   grounds for revoking your supervised release.  It will be your

23   obligation to inform other residents of the premises or users

24   of the electronic devices that they might be subject to a

25   search under this condition.

1          In addition, sir, during that period, you'll provide

2     the probation officer with access to any requested financial

3     information, and you'll also will not incur any new credit

4     charges or open any additional lines of credit, without the

5     approval of the probation officer unless you're in compliance

6     with the installment payment schedule.

7          As I mentioned earlier, restitution in the amount of

8     $36,000 is imposed jointly and severally with the other

9     co-defendants.  Payments will begin no later than one month

10    following your release from incarceration.  Payments will be

11    made in amounts no smaller than 10 percent of your gross

12    monthly income.  Payments shall be made to the Clerk of the

13    Court, United States District Court, Southern District of New

14    York, 500 Pearl Street, New York, New York, 10007.  From time

15    to time, the clerk of the court shall disburse payments to

16    Martin Jewelers, 12 N Avenue W, Cranford, New Jersey, 07016,

17    attention Ellen Ramer, owner.  With the re line of your name

18    and the docket number of this case, S4 14 CR 130.  Payments

19    should be made monthly.

20          Finally, sir, I must impose and do impose the

21    mandatory $100 special assessment.  And that should be paid

22    promptly.

23          It is my duty to inform you that unless you've waived

24    it, you have the right to appeal this sentence.  And you might

25    have the right to the appeal in forma pauperis, which means as

HAN3DEHS                        Sentence

1    a poor person, with the waiver of certain fees and expenses.

2            Counsel, is there anything further?

3            MR. PELLEGRINO:  The government moves to dismiss any

4    open counts, your Honor.

5            THE COURT:  So ordered.

6            MS. BENNETT:  Nothing, your Honor.  Just one question

7    on restitution.  Would it be possible to order that that begin

8    one month after Mr. Dehoyos is released from community housing?

9    Only that there may be some restrictions on his movement that

10   might interfere with gainful employment during that time.

11           THE COURT:  One month after your release, sir, from

12   the halfway house.

13           THE DEFENDANT:  All right.

14           MS. BENNETT:  Thank you, your Honor.

15           THE COURT:  Anything else?

16           MS. BENNETT:  Nothing further.

17           THE COURT:  Mr. Dehoyos, you sound like a changed man.

18   You've certainly persuaded me.  Don't embarrass counsel and

19   don't embarrass your daughter by coming back here.

20           THE DEFENDANT:  I won't, your Honor.

21           THE COURT:  All right.  Sir, you can come and visit

22   any time you want, but I don't want to see you sitting at that

23   table again.

24           THE DEFENDANT:  Okay.  No problem.

25           THE COURT:  All right.  You have a wonderfully

HAN3DEHS                        Sentence

1  beautiful daughter.  And now go out and make her proud.

2           Thank you, counsel, thank you for your assistance.

3           MS. BENNETT:  Thank you, Judge.

4           MR. PELLEGRINO:  Thank you, your Honor.

5           (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25